**The PEOPLE of the State of Colorado, Plaintiff–Appellee and Cross–Appellant,**

v.

**Antonio Ennis MOORE, Defendant–Appellant and Cross–Appellee.**

No. 05CA1592.

Colorado Court of Appeals, Div. III.

Feb. 5, 2009.

Rehearing Denied April 23, 2009.

Certiorari Dismissed June 17, 2009.

John W. Suthers, Attorney General, John T. Lee, Assistant Attorney General, Denver, Colorado; Carol Chambers, District Attorney, Andrew Cooper, Senior Deputy District Attorney, Centennial, Colorado, for Plaintiff–Appellee and Cross–Appellant.

Douglas K. Wilson, Colorado State Public Defender, Andrea R. Manning, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant and Cross–Appellee.

Opinion by Judge LOEB.

Defendant, Antonio Ennis Moore, appeals the judgment of conviction entered upon a jury verdict finding him guilty of theft by receiving-$15,000 or more, a class 3 felony. Moore also appeals the trial court's judgment adjudicating him a habitual criminal. The People cross-appeal the trial court's ruling dismissing a count of second degree burglary-dwelling and a count of criminal mischief as a sanction for the prosecution's discovery violation. We vacate the judgment of conviction and sentence for theft by receiving-$15,000 or more, and remand the case for entry of judgment of conviction and sentencing for theft by receiving—more than $500 but less than $15,000, and for correction of the mittimus. In all other respects, we affirm the judgment and sentence. With respect to the cross-appeal, we disapprove the trial court's order.

### Defendant's Direct Appeal

### I. Background, Facts, and Procedural History

On July 15, 2004, G.F. came home and discovered the house he shared with his wife, S.F., had been burglarized. It appeared someone had entered the house by breaking a basement window. G.F. found the couple's safe, which was normally located in the upstairs bedroom closet, in the downstairs living room. The safe door and its contents were missing, with the exception of some jewelry remaining on the floor.

The next day, Moore's parole officer arrived at his apartment for a scheduled meeting. During the meeting, the parole officer thought Moore was acting nervous, and she asked him to sit down. Moore sat down on an end table next to the couch. The parole officer asked him to move to the couch. When Moore did so, the parole officer noticed a bag under the end table. The bag contained what appeared to the parole officer to be coins and small boxes. The bag also contained another bag with the words "Stolen from [G.F.]" written on it. Although Moore told the parole officer it was his coin and jewelry collection, she was suspicious and called the police, who then took Moore into custody.

Four days later, the parole officer looked up G.F. in the phonebook. When she called the listing for that name, G.F. told her he had recently been the victim of a burglary. The Littleton Police Department confirmed that information.

At trial, G.F. testified that, when he was a teenager, he marked a bag containing his coin and marble collection with the words "Stolen from [G.F.]." He testified that he thought writing "Stolen from [G.F.]" on the bag would prevent his brother from taking it.

After the police investigation of the burglary, the victims made a detailed list of stolen items, which included their estimate of each item's value. After the list was made, the couple went to the police station to identify items recovered from Moore's apartment. Both victims testified at trial that some of the items recovered by the police did not belong to them. The couple also recorded which items on their list were recovered by the police.

Moore went to trial on counts of theft— $15,000 or more (a class 3 felony); second degree burglary—dwelling (a class 3 felony); criminal mischief—$500 to $15,000 (a class 4 felony); theft by receiving—$15,000 or more (a class 3 felony); and four habitual criminal counts.

During the trial, the second degree burglary and criminal mischief counts were dismissed by the trial court as a sanction for a discovery violation by the prosecution. As a result, the court only submitted the theft and the theft by receiving counts to the jury. The court also gave the jury a special interrogatory, directing it to find whether the value of the items stolen was $500 to $14,999 or $15,000 or more, if they found him guilty of either theft or theft by receiving. The jury found Moore not guilty of theft, and found him guilty of theft by receiving— $15,000 or more.

Moore was then tried by the court on the habitual criminal counts. The trial court found Moore guilty on all four habitual criminal counts and sentenced him to forty-eight years in the Department of Corrections (DOC). This appeal and cross-appeal followed.

### II. Jury Selection

Moore contends the trial court reversibly erred by denying his motion for mistrial because the court lacked statutory authority to summon a second jury panel after the original jury was sworn. The second panel was necessary to fill the alternate position and to replace two jurors who were excused for cause before trial began. We discern no reversible error.

### A. Proceedings in the Trial Court

Prior to voir dire, the trial court advised the parties that its policy in criminal cases was to "seat 12 jurors plus one alternate." However, after the jury was sworn, the trial court discovered that only twelve jurors, but not the alternate, had actually been sworn. In light of this oversight, the parties and the trial court agreed another juror would be

selected through voir dire of six additional potential jurors. Defense counsel agreed to the process but reserved the right to object: "That process sounds fine to me; I don't object to it at this time. I'd like to reserve that issue in case we [wind] up with six venire men/women—I don't know—I'd like to reserve that issue until I further review their questionnaires."

Before impaneling the new venire, the trial court received a note from one of the sworn jurors stating that, because she was a student in Fort Collins, she would have difficulty getting to court. After discussing the issue with counsel, the trial court decided to seat two of the six people in the new venire, one to fill the alternate spot and one to fill the student juror's spot, assuming a final decision was made to excuse her. Defense counsel requested a modification in the procedure: "[G]iven five of the six potential jurors are crime victims of home [break-ins] and burglaries, I respectfully request the Court for a larger pool of potential jurors."

Consequently, the trial court checked on whether another six potential jurors were available, for a total of twelve. During further questioning by the trial court, the student juror stated she voted in Larimer County and lived in Durango, and, accordingly, she was excused with no objection from the parties.

The trial court then gave Moore and his counsel a chance to confer about whether to proceed with a six-person venire or wait for the extra six potential jurors. Before Moore and his counsel decided how to proceed, the trial court announced six more potential jurors were available, for a total of twelve.

Before voir dire began of the new twelve-person venire, the trial court received a note from another sworn juror, which stated: "I am concerned my recognizability, ... local t.v. sports anchor[,] could lead to my judgment being affected due to concerns the accused might want retaliation if convicted. And would know who I am and where to find me." On questioning, this juror stated he brought the issue to the court's attention because he felt he would not be able to apply the law to the facts as directed by the judge. He also expressed concern about complying with the instruction to the jury to disregard media reports because keeping up on such information was part of his job. Defense counsel requested that the trial court excuse this juror for cause. The prosecution took no position, and the trial court then excused the juror for cause. Consequently, the court determined that three jurors would need to be selected from the new twelve-person venire.

Based on these developments, Moore's counsel then moved for a mistrial, arguing that it would be difficult to "pick three jurors out of 12 people, two peremptories, 20 minutes a piece, and protect Mr. Moore's right to a fair and impartial jury." The trial court denied the motion, ruling, "[I do] not find manifest necessity to declare a mistrial. We will protect Mr. Moore's right." In that regard, the court further decided to allow each side three peremptory challenges. The trial court and the parties proceeded to voir dire, and, ultimately, three new jurors were selected and sworn.

### B. Standard of Review

■ A trial court has broad discretion to grant or deny a motion for mistrial. *People v. Russom*, 107 P.3d 986, 992 (Colo.App. 2004). A reviewing court will not disturb a trial court's decision absent gross abuse of discretion and prejudice to the defendant. *Id.* Moreover, a mistrial is a drastic remedy that is warranted only where there is prejudice to the defendant that cannot be remedied by other means. *Id.* A trial court necessarily abuses its discretion when it bases its ruling on an erroneous view of the law. *People v. Pagan*, 165 P.3d 724, 729 (Colo.App. 2006).

■ Further, a trial court has substantial discretion to manage the flow of the trial. *Russom*, 107 P.3d at 993. However, a trial court may abuse its discretion when its method of selecting a juror results in prejudice to the defendant. *Id.; see Carrillo v. People*, 974 P.2d 478, 490–93 (Colo.1999)(determining that mid-deliberation replacement of a juror raises a presumption of prejudice that can be overcome by procedural precautions taken by the trial court); *People v. Tippett*, 733 P.2d

1183, 1196 (Colo.1987)(concluding that, although the trial court erred in selecting alternate jurors at the end of the trial, the error was not prejudicial, and therefore, not reversible).

### C. Analysis

On appeal, Moore specifically contends the trial court "exceeded its authority and acted without jurisdiction when it summoned a second jury panel from which to select two replacement jurors and an alternate." We disagree.

Initially, we address the People's threshold argument that Moore did not preserve this contention for appellate review.

We agree with the People that the record shows that Moore did not specifically object or move for a mistrial on the ground he now asserts on appeal. Rather, his objections at trial to the procedure adopted by the court were addressed solely to whether it would be possible to call a sufficient number of additional potential jurors to fill the three vacant spots and ensure Moore's right to a jury of twelve.

■ The purpose of an objection is not only to express disagreement with a proposed course of action, but also to identify the grounds for disagreement. An objection must be specific enough to provide the trial court with a meaningful opportunity to prevent or correct the error. *People v. Rodriguez*, 209 P.3d 1151, 1156 (Colo.App. 2008).

Here, it is not evident that defense counsel's objections or mistrial motion would have alerted the trial court to the specific contention Moore now raises on appeal, namely, that the jury selection procedure used by the court was not authorized by statute. Nevertheless, for purposes of resolving that issue and because Moore reserved the right to object and moved for a mistrial, we will assume Moore's contention was properly preserved for review. *Id.*

Section 16–10–102, C.R.S.2008, provides for summoning additional jurors:

> In all criminal cases where the panel of jurors is exhausted by challenge or otherwise, and whether any juror has been selected and sworn or not, the court may order the issuance of a venire for any number of jurors not exceeding twenty-four, returnable forthwith, out of which persons so ordered to be summoned it is lawful to impanel a jury for the trial of any criminal case. Should the jurors thus summoned be insufficient, by reason of challenges or otherwise, to form an impartial jury, the court may make further orders for additional jurors, returnable forthwith, until a full jury is obtained.

Further, section 16–10–105, C.R.S.2008, provides, in pertinent part, "The court may direct that a sufficient number of jurors in addition to the regular jury be called and impaneled to sit as alternate jurors."

Here, the panel of jurors was exhausted, and twelve jurors were initially sworn before the court and the parties discovered that the agreed-upon alternate had not been sworn. The trial court ordered the issuance of a venire for six, and later twelve, additional jurors, out of which three were impaneled for Moore's case, thus constituting a full jury of twelve plus one alternate. Under the circumstances, and given the broad discretion of the court to manage a trial, *see Russom*, 107 P.3d at 993, we conclude that sections 16–10–102 and 16–10–105 provided the court with appropriate statutory authority to follow the jury selection procedure utilized here.

We reject Moore's argument that section 16–10–106, C.R.S.2008, mandated the only statutory procedure that could be used in this situation. Section 16–10–106, concerning incapacity of a juror, provides as follows:

> Where a jury of twelve has been sworn to try the case, and any juror by reason of illness or other cause becomes unable to continue until a verdict is reached, the court may excuse such juror. If no alternate juror is available to replace the juror, the parties at any time before verdict *may* stipulate in writing with court approval that the jury shall consist of any number less than twelve, and the jurors thus remaining shall proceed to try the case and determine the issues unless discharged by the court for inability to reach a verdict.

(Emphasis added.) We disagree with Moore that this statute provided the only proce-

dures that the court and the parties could follow. While section 16–10–106 provides one procedure that the parties and the trial court *may* have utilized, it was not the only procedure available, and, indeed, did not even cover the situation of selecting the alternate juror. As discussed above, an alternative selection procedure permitted by section 16–10–102 was utilized here. Therefore, we are not persuaded by Moore's contention that the trial court acted without authority in selecting jurors from the second panel.

█ Further, we discern no prejudice to Moore resulting from the procedure employed by the trial court. Moore does not maintain that any of the jurors selected were biased, or that the selection of the new jurors resulted in an unfair trial. Indeed, here, the replacement jurors were all subject to voir dire and each side had three peremptory challenges. *See Russom,* 107 P.3d at 993 (concluding there was no prejudice to the defendant when there were no allegations that a juror, subject to voir dire and challenges before trial, was biased or that the replacement of a juror resulted in an unfair trial); *Tippett,* 733 P.2d at 1196 (explaining there was no prejudice when the defendant did not claim that the jurors selected were other than fair and impartial). In addition, the trial court was aware of Moore's concerns about receiving an impartial jury and specifically accommodated Moore's request for a larger pool of replacement jurors to voir dire. Therefore, we do not perceive any prejudice to Moore as a result of summoning a second jury panel to fill the alternate position and to replace the two jurors who were excused for cause.

In sum, because the trial court followed a procedure authorized by statute and there was no prejudice to Moore, we perceive no abuse of discretion in the court's denial of the motion for mistrial.

## III. Sufficiency of the Evidence on Value

Moore contends the prosecution failed to present sufficient evidence of value of the stolen items received by him to support his conviction for theft by receiving–$15,000 or more, a class 3 felony. We agree.

### A. Standard of Review and Applicable Law

The applicable theft by receiving statute in effect at the relevant times, provided in pertinent part:

(1) [A] person commits theft by receiving when he receives, retains, loans money by pawn or pledge on, or disposes of anything of value of another, knowing or believing that said thing of value has been stolen, and when he intends to deprive the lawful owner permanently of the use or benefit of the thing of value.

. . . .

(4) Where the value of the thing involved is five hundred dollars or more but less than fifteen thousand dollars, theft by receiving is a class 4 felony.

(5) Where the value of the thing involved is fifteen thousand dollars or more, theft by receiving is a class 3 felony.

§ 18–4–410(1), C.R.S.2008; Ch. 314, sec. 13, § 18–4–410(4), 1998 Colo. Sess. Laws 1438; Ch. 80, sec. 4, § 18–4–410(5), 1992 Colo. Sess. Laws 435; *cf.* § 18–4–410(4)–(5), C.R.S.2008 (effective July 1, 2007, raising value limits).

Here, there is no dispute that all elements of the theft by receiving statute, other than the element of value, were proved by the prosecution beyond a reasonable doubt. In addition, Moore concedes there was sufficient evidence of value in the amount of $1,211.55. Thus, the issue we must decide is whether there was sufficient evidence of value of $15,000 or more or whether, as argued by Moore, we should vacate the class 3 felony conviction and remand for judgment to be entered for theft by receiving–$500 or more but less than $15,000, a class 4 felony.

When assessing the sufficiency of the evidence in support of a finding of guilt, a reviewing court must determine whether any rational trier of fact might accept the evidence, taken as a whole and in the light most favorable to the prosecution, as sufficient to support a finding of the accused's guilt beyond a reasonable doubt. In applying this standard, we must give the prosecution the benefit of every reasonable inference that might fairly be drawn from the evidence.

*People v. Denton,* 91 P.3d 388, 390 (Colo.App. 2003). Moreover, an appellate court is not permitted to act as a thirteenth juror and set aside a verdict because it might have drawn a different conclusion had it been the trier of fact. *People v. Jaramillo,* 183 P.3d 665, 670 (Colo.App.2008).

 Where, as here, the value of the item stolen determines the grade of the offense, the People must present competent evidence of the reasonable market value of the item at the time of the commission of the alleged offense. *People v. Jensen,* 172 P.3d 946, 949 (Colo.App.2007). Market value is what a willing buyer will pay in cash to the true owner for the stolen items. *People v. A.G.,* 43 Colo.App. 514, 516, 605 P.2d 487, 489 (1979).

 An owner is always competent to testify as to the value of his or her property. *People v. Paris,* 182 Colo. 148, 151, 511 P.2d 893, 894 (1973). However, the testimony must relate to the value of the property at the time of the commission of the crime. *Id.* Moreover, testimony on the purchase price of goods is competent evidence of fair market value only where the goods are so new, and thus, have depreciated in value so insubstantially, as to allow a reasonable inference that the purchase price is comparable to current fair market value. *Id.* Furthermore, there must be some basis for value other than pure speculation. *A.G.,* 43 Colo.App. at 516, 605 P.2d at 489. Although replacement cost may be a factor in determining the value of stolen items, the evidence of replacement cost alone is not sufficient to prove the value of the property. *Id.* at 517, 605 P.2d at 489.

### B. Summary of the Evidence at Trial

The evidence at trial on the issue of value consisted exclusively of the testimony of the victims, G.F. and S. F., based on the list of stolen items they compiled after the burglary and their perception of the value of the items. The prosecution did not have the recovered stolen items appraised for value, nor did it present any expert testimony on the subject.

With respect to items that were stolen and recovered, the victims valued such items at $19,356.55. Most of these items were pieces of jewelry, coins, and currency. With respect to the stolen items that were not recovered, the victims gave them a value of $15,182. Again, most of these items were jewelry, coins, and currency, along with $7,900 in matured savings bonds.

A review of the testimony reveals that most of the victims' value assessments were based on their "best guesses" or "estimates" or what they "assumed" the items were worth. Many of the valuations were based on exhibits not admitted into evidence, such as a 1984 appraisal of some of the items or hearsay statements of what others had told them certain items were worth. Further, many of the victims' value assessments were based on the purchase price of items decades prior to the theft.

Without detailing the testimony relating to each stolen item, we summarize and set forth examples below of the testimony of both victims.

Generally, G.F. testified he based his valuations on prices he would accept if he sold the items. S.F. testified her value assessments were based on a 1984 appraisal not admitted into evidence, purchase prices (some decades old), and a few similar items she found at a shopping mall. She also stated she believed the value of the appraised items was greater at the time of the theft than in 1984, but she had no further basis for that opinion.

Many of the stolen items were from G.F.'s coin collection. He testified that he collected coins about thirty or thirty-five years ago, when he was between the ages of twelve and nineteen. When asked about his expertise in valuing coins, he stated that he was "an amateur at best." He also explained that any research he did on coins ended around 1970, when he was about nineteen years old. For example, he testified that the $400 value he ascribed to some silver certificate bills was "a guess."

Both victims also testified about several items they valued based on original purchase price. For example, G.F. testified he purchased half-karat diamond earring studs in 1987 for $1,500. He also testified a 1951 coin

set was worth $20 based on "the purchase price and expected valuation of it over the years." However, the court sustained Moore's objection as to the testimony of expected valuation. S.F. testified, for example, she valued a gold watch based on what her mother paid for it in 1964. Likewise, she based the value of a gold bead necklace based on what her sister paid for it 1982, and she valued a 1925 Mickey Mouse watch based on what her mother told her she paid for it.

S.F. valued several items based on what she believed were comparable items she saw at a shopping mall. For example, she used that method to value a jade necklace and testified that she could not "testify to the quality of the jade on either one, but it looked visibly like the same one to [her]." She further testified her comparison was based only on a visual examination.

S.F. also valued several items based on a 1984 appraisal that the court refused to admit into evidence at trial, based on Moore's objection that the appraisal was hearsay and lacked sufficient foundation. For example, she valued an engraved box and her father's wedding ring based on values in the 1984 appraisal. G.F. also gave his opinion on the value of certain items based only on the 1984 appraisal, including a Seiko watch and a man's wedding band.

Some of the stolen cash and coins were given their face value by the couple, including two rolls of Susan B. Anthony dollars, two rolls of Delaware quarters, three $100 bills, thirty-one silver nickels, Eisenhower silver dollars, and four rolls of pre–1940 quarters.

The victims used replacement cost on their list for those items they were able to replace. G.F. testified, for example, that he spent $2.50 to replace copies of their house closing documents.

The victims also testified concerning the value of approximately seventy items that were never recovered or found in Moore's possession. Their valuation testimony for these items mirrored their testimony for the recovered items. For example, G.F. testified regarding a silver chain bracelet that was never recovered, opining that its value was

$45: "I believe I purchased it for [S.F.] in Mexico a number of years ago.... Just seems that—seems like what I paid for it— my recollection." He also testified it was purchased more than ten years prior to trial. Matured savings bonds worth $7,900 were also never recovered. As noted, the couple's total valuation for the items not recovered was $15,182.53.

## C. Analysis

■ Based on our review of the testimony at trial and the applicable Colorado law, we conclude that, as a matter of law, there was insufficient evidence to prove that the value of the stolen items received by Moore was $15,000 or more. Rather, as summarized above, the vast majority of the valuation testimony was based on speculation, guesses, assumptions, purchase prices many years old, and evidence not admitted at trial. Under these circumstances, even applying the very deferential standard of review for assessing the sufficiency of evidence, the evidence here was simply not sufficient to support the jury's finding that the value of the items was $15,000 or more.

*People v. A.G.* is instructive here. In that case, owners testified regarding the 1971 purchase price of property stolen in 1978 and what they "assumed" it would cost to replace those items. *A.G.*, 43 Colo.App. at 517, 605 P.2d at 489. A division of this court concluded that, because of the age of the items, neither the purchase price nor the replacement cost could be reasonably equated with the fair market value of the goods at the time of the taking. *Id.* As a result, the division concluded the jury's verdict could only be based on pure speculation, and therefore, the evidence of value was insufficient to sustain the conviction. *Id.* Likewise, here, because of the age of many of the items, the original purchase prices could not be reasonably equated with the fair market value of the goods at the time of the theft decades later.

Similarly, in *People v. Paris,* the owner of stolen items testified regarding the purchase prices of those items three or four years prior to the theft, but provided no testimony about the current value of the items. *Paris,* 182 Colo. at 151, 511 P.2d at 894. The

supreme court concluded the prices three years earlier were too attenuated from the time of the theft to show fair market value, and therefore, the testimony of the owner was not sufficient to prove value. *Id.* Here, the purchase prices of the stolen items were decades old. Moreover, the victims' testimony here as to original purchase prices was often based on what other people told them an item had been purchased for ten or more years prior to the theft. Also in *Paris,* the owner stated on cross-examination he did not know the value of his property at the time of the theft. *Id.* at 151, 511 P.2d at 894. Likewise here, both victims admitted they were essentially guessing as to the value of most of the items.

The evidence here also differs in significant respects from that considered sufficient to prove value in other Colorado cases. For example, in *People v. Jensen,* 172 P.3d at 949–50, a division of this court held there was sufficient evidence of value, because the owner testified regarding the cost of the stolen property and, in addition, an investigator testified about the current value of the property. Likewise, in *People v. Williams,* 654 P.2d 319, 322–23 (Colo.App.1982), where the defendant purchased stolen property from an undercover detective, another division of this court held that testimony from two experts about the fair market value of the items and from the detective about the nature of the merchandise (which was still brand new and in boxes when received by the defendant) was sufficient to prove value. Here, by contrast, only the owners testified as to the value of the stolen property.

In *People v. Evans,* 44 Colo.App. 288, 291, 612 P.2d 1153, 1155 (1980), a division of this court held that testimony by the owner of a stolen watch and some food stamps was sufficient to establish the value of those items. There, the record showed the watch was purchased for less than fair market value. *Id.* at 291, 612 P.2d at 1156. In contrast, here, there is nothing in the record indicating the victims paid less than fair market value for any of their stolen property. However, Moore concedes, and we agree, that like the food stamps in *Evans,* the face value of some items here, such as cash and coins, was suffi-

cient evidence of the value of those items. Indeed, Moore concedes that there was sufficient proof of value for recovered items in the amount of $1211.55, which includes the face value of all such recovered items.

In addition, the People argue it was reasonable for the jury to conclude that Moore received all of the stolen items, including those items never actually recovered, and to include the values of these items in its verdict. Even assuming that the jury could reasonably have found Moore received the items that were stolen but not recovered, the evidence of those additional items' value still does not establish a total valuation of $15,000 or more. As discussed, there was not sufficient evidence for most of the items not recovered because the victims' valuations were based on speculation, purchase prices from years ago, guesses, and estimates.

The face value of items stolen but not recovered included bonds worth $7,900 and several hundred dollars in cash and coins. Adding the value of those items to the valuation amount of stolen and recovered items conceded by Moore still only totals $9,571.55. Further, even assuming there was also sufficient evidence to prove the value of a few stolen items that were replaced by the victims (for example, stolen passports and house closing documents), the total valuation for all stolen items is still only approximately $10,400. *See A.G.,* 43 Colo.App. at 517, 605 P.2d at 489 (determining replacement cost may be a factor in determining the value of stolen items).

Consequently, we conclude there was not sufficient evidence for a conviction on theft by receiving-$15,000 or more, a class 3 felony. Accordingly, we vacate the judgment of conviction on the class 3 felony and remand for entry of judgment and resentencing on the class 4 felony, theft by receiving—more than $500 but less than $15,000.

## IV. Mistrial

Moore contends the trial court reversibly erred by denying his motion for mistrial, because the prosecution's statements at trial regarding his parole officer unfairly suggested to the jury that Moore had a history of prior criminality. We disagree.

At a status conference prior to trial, Moore moved to preclude the prosecution from bringing up his status as a parolee at trial. The prosecution contended Moore's parole status and the parole officer's role in the events here were admissible as res gestae. The trial court initially agreed with the prosecution, but also agreed to give a limiting instruction if evidence of Moore's parole status was introduced at trial.

On the morning of trial, when the trial court was reviewing with counsel the proposed limiting instruction, Moore's counsel again objected to the introduction of Moore's parole status. Defense counsel offered to stipulate that the parole officer could be referred to as a peace officer who had good reason or reasonable suspicion to contact Moore and search his apartment. The trial court reversed its earlier ruling, finding "that reference to the parole status of Mr. Moore is [fraught] with numerous problems," and accepted defense counsel's stipulation instead of giving a limiting instruction. The trial court concluded, "[W]e just need to avoid any reference to Mr. Moore being on parole on the date in question. The use of the word parole is probably the problem we need to avoid."

Accordingly, during its opening statement, the prosecution referred to the parole officer as a peace officer. The prosecutor expressly pointed out that she not was a police officer under Colorado law:

> She's not a police officer. She doesn't work for the Denver Police Department. She doesn't work for the Littleton Police Department, but she's a peace officer. And in the course of exercising her responsibilities in her job as a peace officer she was looking at where this defendant was living. She began her familiarity with this defendant in early 2004. . . . And then on June 30th he had obtained her permission to move to an apartment.

Defense counsel objected "[b]ased upon . . . rulings before this trial began," and the trial court sustained the objection. Defense counsel objected again when the prosecution stated, "Well, on instructions from [the parole officer], the Denver Police Department placed [Moore] in custody, not particularly on this offense, but on authority from ———." The court again sustained the objection.

At a bench conference after both sides completed their opening statements, Moore requested a mistrial based on the two statements to which he had objected. The trial court determined that, under the totality of the circumstances "the references by [the prosecution] were oblique in nature": "And while certainly I do not necessarily think they were the best choice of words, I do not believe a mistrial is warranted at this time. What I'm going to ask . . . is that you be a little more careful in your word choice in the future please." Accordingly, the court denied the motion for mistrial.

On direct examination, the parole officer testified that she was a peace officer, not a police officer. She also testified concerning her meeting with Moore at his new apartment on July 16, 2004.

After the parole officer's direct examination, the trial court received a question from the jury that read: "What is a peace officer? What do they do? And why would she have contact with the defendant?" At a bench conference, the parties agreed to the following answer, which the court read to the jury: "First answer is, a peace officer is an individual who is sworn to uphold the law. And secondly, there is an agreement by the prosecution and defense that [the peace officer] had good reason to contact the defendant."

Moore contends that the court erred by denying his motion for a mistrial and that the prosecution's references to the parole officer as a "peace officer" were insufficient to negate the suggestion to the jury that Moore had a prior criminal history. We are not persuaded.

■■■■ "[A] mistrial is the most drastic of remedies. The trial court has broad discretion to grant or deny a mistrial, and its decision will not be disturbed on appeal absent gross abuse of discretion and prejudice to the defendant." *People v. Abbott,* 690 P.2d 1263, 1269 (Colo.1984) (citation omitted). Simply referencing a defendant's past criminal act is not per se prejudicial requiring a new trial; rather the circumstances of each

case must be reviewed to determine the prejudice to the defendant. *Id.*

▉ Here, assuming without deciding that the prosecutor's comments went well beyond the court's ruling that the parole officer should simply be referred to as a peace officer who had good reason to contact Moore, we nevertheless perceive no prejudice to Moore, and therefore, no abuse of discretion in the court's denial of his request for a mistrial. We agree with the People that there is no indication the jury interpreted the references in the prosecution's opening statement to mean the peace officer was actually a parole officer who visited Moore because of his past crimes. Indeed, the parties agreed on a resolution to the jury's inquiry regarding the role of a peace officer. Moreover, the trial court considered the challenged references and determined they were "oblique in nature." *See People v. Cousins,* 181 P.3d 365, 373 (Colo.App.2007); *People v. Washington,* 179 P.3d 153, 168 (Colo.App.2007) ("The trial court is in the best position to evaluate the propriety of counsel's argument and its potential impact on jurors in the context of the entire proceedings."), *aff'd,* 186 P.3d 594 (Colo.2008).

Because we conclude there was no abuse of discretion, we need not address the People's contention regarding invited error. *See Horton v. Suthers,* 43 P.3d 611, 618 (Colo.2002).

## V. Habitual Criminal Counts

Moore challenges his adjudication as a habitual criminal on two separate grounds. First, Moore contends the prosecution failed to present sufficient evidence to prove his identity as the person previously convicted for two of the four habitual criminal counts. Second, Moore contends his Sixth Amendment right to trial by jury was violated because a judge, rather than a jury, determined the habitual criminal charges. We disagree with both contentions.

### A. Sufficiency of the Evidence

Moore contends the prosecution failed to prove his identity as person previously convicted for two of the four habitual criminal counts. We disagree.

A challenge to the sufficiency of the evidence requires a reviewing court to determine whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable person that the defendant is guilty of the crime charged beyond a reasonable doubt. The prosecution must be given the benefit of every reasonable inference that might fairly be drawn from the evidence. *People v. Carrasco,* 85 P.3d 580, 582–83 (Colo.App.2003).

Section 18–1.3–803(4), C.R.S.2008, provides in pertinent part: "If the defendant denies that he or she has been previously convicted as alleged in any count of an information or indictment, the trial judge ... shall determine by separate hearing and verdict whether the defendant has been convicted as alleged."

▉ "In a habitual criminal action, the prosecution bears the burden of proving beyond a reasonable doubt that the accused is the person named in the prior convictions." *People v. Martinez,* 83 P.3d 1174, 1179 (Colo. App.2003).

▉ "Offering evidence of fingerprint cards and expert testimony linking those prints to the defendant is a valid method for proving the identity element, but it is not the only way to show identity." *Carrasco,* 85 P.3d at 583.

The state originally charged Moore with five habitual counts. One count was dismissed the morning of the habitual criminal trial. The remaining counts included count five, a conviction for theft in Jefferson County; count six, a conviction for theft by receiving in Arapahoe County; and counts seven and eight, separate convictions for second degree burglary in Arapahoe County.

On appeal, Moore contends the prosecution did not present sufficient evidence to prove his identity as the person who was convicted under counts seven and eight. We are not persuaded.

At the habitual criminal trial, a paralegal for the 18th Judicial District Attorney's office testified that on February 18, 2005 she wit-

nessed Moore being fingerprinted and photographed for comparison to fingerprints and photographs from the previous convictions. She signed and dated the fingerprint card and photograph. She then submitted the materials to a supervising criminalist at the Arapahoe County Sheriff's Office for fingerprint comparison.

The criminalist also testified at the habitual criminal trial. After being qualified as an expert, she testified that she compared the fingerprints witnessed by the paralegal to fingerprint cards from two other docket numbers, one from Arapahoe County and one from Jefferson County (counts five and six). On cross-examination, defense counsel confirmed that the expert's fingerprint comparison was done for counts five and six, but not for counts seven and eight.

A number of exhibits were also admitted into evidence, including "pen packets" containing a fingerprint card from the Department of Corrections (DOC) for counts five and six; mittimuses for each of the four cases listing the same DOC registration number; and a photograph of Moore holding a plaque showing his DOC number.

The trial court found that there were four separate felony convictions that were separately brought and tried, arising out of separate and distinct criminal episodes in Colorado. Based on the documentary evidence, as well as the testimony of the witnesses (which the trial court found credible), the court concluded "the identification of the defendant as the person who committed these four separate offenses has been proven beyond a reasonable doubt."

■ Based on our review of the record, we perceive no error in the trial court's conclusion. Here, the witnesses established that Moore's fingerprints were the same as those fingerprints in the pen pack for counts five and six. As described in detail by the trial court in its findings, the DOC identification number from counts five and six was the same as the number listed on the mittimuses for count seven and count eight. There was a photograph of Moore holding a plaque with his DOC number. This DOC number was the same number on the fingerprint cards. The number on the fingerprint cards and the

photograph of Moore was the same number on the mittimuses for counts seven and eight.

Accordingly, we conclude the evidence was sufficient to establish a chain of identity proving beyond a reasonable doubt that Moore was the person convicted in all four of the prior cases on which the habitual criminal counts were based. *See Carrasco*, 85 P.3d at 583–84; *Martinez*, 83 P.3d at 1180.

### B. Sixth Amendment

Moore contends his Sixth Amendment right to a jury trial was violated because a judge, rather than a jury, determined the habitual criminal counts. We disagree.

■ In habitual criminal proceedings, the prosecution bears the burden of proving beyond a reasonable doubt that the defendant has been previously convicted as alleged. *People v. Nunn*, 148 P.3d 222, 225–28 (Colo. App.2006). Generally, any fact, other than the fact of a prior conviction, that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. *Blakely v. Washington*, 542 U.S. 296, 303, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004); *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). "Although there is some doubt about the continued vitality of the prior conviction exception," *Lopez v. People*, 113 P.3d 713, 723 (Colo. 2005), the United States Supreme Court and Colorado Supreme Court have repeatedly affirmed the exception. *See United States v. Booker*, 543 U.S. 220, 244, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005); *Blakely*, 542 U.S. at 301, 124 S.Ct. 2531; *People v. Huber*, 139 P.3d 628, 631 (Colo.2006); *Lopez*, 113 P.3d at 723.

■ *Apprendi*'s prior conviction exception extends to the additional statutory factual findings for each prior conviction necessary to support a habitual criminal sentence: (1) that each prior conviction was separately brought and tried; (2) that they arose out of separate and distinct criminal episodes; and (3) that the accused was the person named in each prior conviction. *Nunn*, 148 P.3d at 226–28; *see Lopez*, 113 P.3d at 726; *People v.*

*Benzor*, 100 P.3d 542, 545 (Colo.App.2004); *Carrasco*, 85 P.3d at 582.

A division of this court has considered the precise issue and rejected Moore's argument. *Nunn*, 148 P.3d at 226–28. We perceive no reason to revisit the division's conclusion, which is dispositive of Moore's claim. *See id.*

## VI. Mittimus

Both parties agree the mittimus incorrectly states that Moore was convicted of second degree burglary, instead of theft by receiving. On remand, the trial court should correct the mittimus to reflect that Moore was convicted of theft by receiving.

## People's Cross–Appeal

The People cross-appeal the trial court's order dismissing the counts for second degree burglary and criminal mischief as a sanction for a discovery violation by the prosecution. We disapprove the trial court's ruling.

## I. Background and Procedural History

During the trial, the prosecution called a detective from the Littleton Police Department to testify regarding his role in investigating the burglary. On cross-examination, defense counsel asked the detective about a footprint found outside the victims' house, near the window where the break-in occurred. The detective testified that he compared the shoe print from outside the house to shoes in Moore's property at the jail and that they were not a match. The detective agreed this was exculpatory information and that he failed to put this information in his reports. He also testified that leaving the information out of the reports was a mistake.

At a bench conference after the detective's testimony, Moore's counsel moved for dismissal of counts one through four (theft, burglary, criminal mischief, and theft by receiving) and all the habitual counts, and alternatively, asked for a mistrial. Defense counsel argued that the information about the shoe print comparison was not in the discovery materials produced by the prosecution. Rather, Moore's counsel acquired this information from the parole officer's file,

which he requested when she used the file in her testimony at a suppression hearing just prior to trial.

The trial court agreed the information about the lack of a footprint match was exculpatory evidence that should have been disclosed to Moore by the prosecution prior to trial.

In order to determine what, if any, sanctions were appropriate for the discovery violation, the trial court outlined a number of factors it would consider, including the reason for the nondisclosure, the prejudice caused by the nondisclosure, the feasibility of curing the prejudice with a continuance or recess, and whether the failure to disclose was deliberate. The trial court also stated it would consider any other relevant factors counsel wanted to bring to its attention. The trial court also noted that the purpose of sanctions was to protect the integrity of the truth-finding process and deter misconduct in the future.

After hearing arguments from counsel on all relevant factors, the trial court found the prosecution's nondisclosure was an inadvertent discovery violation. However, the trial court also noted, "[W]ith the nature of these charges, the stakes being so high, the length of time this case has been pending, certainly it's concerning to this Court that this was not brought out earlier in that it is such an exculpatory piece of material. It is troubling to the Court." The trial court acknowledged it should impose the least severe sanctions. Therefore, the court found that dismissing all of the charges was not appropriate, and further determined that "mere scolding of the detective would not be appropriate." Instead, the court dismissed the second degree burglary and criminal mischief counts, because the exculpatory footprint evidence related most directly to the alleged break-in, which was the basis for those two counts. This cross-appeal followed.

## II. Preliminary Issues

We first address and reject two contentions by Moore that we should not consider the merits of the People's cross-appeal.

## A. Jurisdiction

Moore first contends this court lacks jurisdiction to hear the People's cross-appeal because it was not timely filed. We disagree.

Section 16–12–102(1), C.R.S.2008, provides in pertinent part:

> The prosecution may appeal any decision of a court in a criminal case upon any question of law. Any order of a court that either dismisses one or more counts of a charging document prior to trial or grants a new trial after the entry of a verdict or judgment shall constitute a final order that shall be immediately appealable pursuant to this subsection (1).... The procedure to be followed in filing and prosecuting appeals under this section shall be as provided by applicable rule of the supreme court of Colorado.

■■■ "Generally, interlocutory appeals authorized by statute are permissive rather than mandatory, and failure to pursue an immediate appeal does not preclude appeal of the issue when it merges into the final judgment." *People v. Richardson*, 58 P.3d 1039, 1047 (Colo.App.2002). This general rule is equally applicable to allow appeals under section 16–12–102(1) to be filed within forty-five days after final judgment, even though that section does not characterize the immediate appeals permitted therein as interlocutory. *Id.*

Furthermore, section 16–12–102(1) does not preclude deferring an appeal until after final judgment. *Id.* at 1047–48. Rather, appeal is authorized pursuant to the procedural rules of the Colorado Supreme Court, which permit appeal from final judgment and require the People's appeal to be filed within forty-five days of the entry of judgment or order appealed from. *Id.*; C.A.R. 1(a)(1), 4(b)(2); *see Ellsworth v. People*, 987 P.2d 264, 266 (Colo.1999). Thus, pursuant to section 16–12–102(1), the People could have appealed immediately after the court's order imposing sanctions, but they were not required to do so at that time.

We also agree with the People that *People v. Severin*, 122 P.3d 1073 (Colo.App.2005), relied on by Moore, is distinguishable. That case dealt with dismissal of one of several charges prior to trial. *Id.* at 1074. A division of this court determined that C.A.R. 4(b)(3) (which contains a ten-day time limit), not C.A.R. 4(b)(2), was applicable to an appeal of the dismissal of one or more but less than all counts of a charging document prior to trial. *Id.* Therefore, the division concluded that the prosecution's appeal, filed thirty-eight days after the order, was untimely. *Id.* at 1074. Here, by contrast, the order dismissing two of the charges occurred during trial, and therefore, C.A.R. 4(b)(3) is not applicable. Because Moore concedes that the People's cross-appeal was filed within forty-five days of entry of final judgment in this case, we conclude the cross-appeal was timely filed.

## B. Question of Law

Moore also contends we cannot consider the cross-appeal because it does not raise a question of law. Again, we disagree.

Pursuant to section 16–12–102(1), the prosecution may appeal "any decision of a court in a criminal case upon any question of law."

■■■ The choice of an appropriate sanction for a violation of a discovery rule lies within the sound discretion of the trial court. *People v. Daley*, 97 P.3d 295, 298 (Colo.App.2004). Abuse of discretion is a legal question, regularly reviewed as a matter of law. *See Cook v. District Court*, 670 P.2d 758, 761 (Colo.1983)("abuse of discretion" is a legal term reflecting the opinion of an appellate court that the trial judge committed an error of law in the circumstances); *Moats v. Moats*, 168 Colo. 120, 127, 450 P.2d 64, 67 (1969) ("Under the circumstances, we cannot find an abuse of discretion as a matter of law."); *S.F.E. in Interest of T.I.E.*, 981 P.2d 642, 650 (Colo.App.1998) ("Under these circumstances, we cannot say as a matter of law that the trial court's order constitutes an abuse of discretion."); *Kelly v. Mid–Century Ins. Co.*, 695 P.2d 752, 754 (Colo.App.1984) ("While it is an unusual case in which an appellate court must conclude that there has been an abuse of discretion, such a conclusion is required here as a matter of law.").

The cases relied on by Moore are distinguishable. In *People v. Martinez*, 22 P.3d

915, 917–18 (Colo.2001), a death penalty case, the supreme court determined it did not have jurisdiction over the prosecution's appeal from a sentencing decision by one member of a three-judge panel who voted for a life sentence. The court explained that one judge's "resolution of the issues presented by the four-fold inquiry turned on decisions of fact that are not reviewable by this court under section 16–12–102(1) as a determination on a question of law." *Id.* at 920–21. In contrast to a distinctly factual determination about whether to impose a death sentence, here, the issue is whether discovery sanctions were an abuse of discretion as a matter of law.

Likewise, *People v. Welsh,* 176 P.3d 781, 791–92 (Colo.App.2007), is also inapposite. That case involved a cross-appeal by the prosecution, in part, from the trial court's ruling declining to admit into evidence a 911 tape due to uncertainty whether the tape was testimonial in light of the then recent decision in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). *See Welsh,* 176 P.3d at 791. A division of this court declined to approve or disapprove the trial court's ruling, and, instead, dismissed the cross-appeal, because the trial court did not decide whether the tape was testimonial, but only excluded the tape as a cautionary measure to protect the defendant's confrontation rights. *Id.* at 792. Again, that case is unrelated to the issue here—whether the trial court abused its discretion as a matter of law by dismissing two counts as a sanction for the prosecution's admitted discovery violation.

In sum, we conclude the cross-appeal here raises a question of law, and we thus turn to the merits of the People's contention.

### III. Merits

The People contend the trial court abused its discretion by dismissing the second degree burglary and criminal mischief charges as a sanction for an inadvertent discovery violation. We agree.

■ Initially, we note that both parties agree that, because jeopardy has attached, we are only called upon to approve or disap-

prove of the trial court's ruling. Once jeopardy has attached, it prevents the retrial of the defendant, and the only function that our opinion serves is to approve or disapprove the dismissal of the charges under the facts of the case. *People v. Thompson,* 748 P.2d 793, 794 (Colo.1988); *People v. Quintana,* 634 P.2d 413, 420 (Colo.1981).

■ "In the event that a discovery violation is found, the decision whether to impose a sanction is within the sound discretion of the trial court." *People v. Lee,* 18 P.3d 192, 196 (Colo.2001). Because of the multiplicity of considerations involved and the uniqueness of each case, great deference is owed to trial courts in this regard, and, therefore, an order imposing a discovery sanction will not be disturbed on appeal unless it is manifestly arbitrary, unreasonable, or unfair. *Id.*

The imposition of discovery sanctions generally serves the dual purposes of protecting the integrity of the truth-finding process and deterring discovery-related misconduct. *Id.; People v. District Court,* 808 P.2d 831, 836 (Colo.1991).

■ The factors a trial court should consider in fashioning the appropriate sanction include: (1) the reason for the delay in providing the requisite discovery; (2) any prejudice a party has suffered as a result of the delay; and (3) the feasibility of curing such prejudice by way of a continuance or recess in situations where the jury has been sworn and the trial has begun. *Lee,* 18 P.3d at 196.

■ A court should utilize the least severe sanction in light of the goals of discovery sanctions and the factors to be considered. *Id.* at 197. Therefore, "when a continuance or a recess in a trial in progress will cure the prejudice to the defendant, the trial court should go no further in crafting a sanction." *District Court,* 808 P.2d at 837. Furthermore, " '[d]ismissal is a drastic remedy to be reserved for situations where no other sanction would attain the proper result.' " *Id.* (quoting *People v. Holloway,* 649 P.2d 318, 320 (Colo.1982)).

As articulated by the supreme court in *People v. District Court:*

Although dismissal is occasionally necessary to prevent an unfair trial ..., a court must be most cautious in employing that remedy solely as a deterrent to improper conduct by the prosecution. Dismissal of criminal charges for reasons other than the inability of the prosecution to prove them is a highly serious consequence, justifiable only in furtherance of the most important principles. Even if such a severe sanction might be appropriate in some cases of willful misconduct, it is certainly beyond the discretion of the trial court where, as here, the conduct was unintentional.

*District Court,* 808 P.2d at 838; *see Lee,* 18 P.3d at 196 (in the absence of willful misconduct or a pattern of neglect demonstrating a need for modification of a party's discovery practices, the rationale for a deterrent sanction loses much of its force); *Daley,* 97 P.3d at 298 ("In the absence of willful misconduct, dismissal as a sanction for a discovery violation is usually beyond the discretion of the trial court.").

■ Here, although the record demonstrates a careful examination of the issue by the trial court, we nevertheless conclude that the court abused its discretion as a matter of law by ordering dismissal of the two counts as a discovery sanction. The trial court specifically found that the one discovery violation at issue here was inadvertent rather than willful, and we defer to that finding because it is supported by the record. *See District Court,* 808 P.2d at 838. Nor was there any evidence of a pattern of discovery violations by the prosecution. Accordingly, under the circumstances, the court should have sought to impose the least severe sanction, such as a recess, that could have cured any prejudice resulting from the violation. *See Holloway,* 649 P.2d at 320–21 (even where police inadvertently destroyed evidence, dismissal of charges was too severe a sanction where prejudice could have been cured through less drastic remedies); *Lee,* 18 P.3d at 197.

Moore's counsel described the prejudice resulting from the discovery violation as not having time prior to trial to "bring [Moore's] shoes here, and to really demonstrate to the jury what's going on ... and play it out in its entirety and glory in front of the jury." However, the record shows the prosecution specifically proposed a short recess as an appropriate sanction, which would have allowed defense counsel time to obtain Moore's shoes and demonstrate to the jury through witness testimony (including further cross-examination of the detective) that the shoes did not match the footprint outside the victims' house. There is nothing in the record, nor did the trial court make a finding, that such a recess would have been impractical or disruptive of the trial. Yet, the trial court declined to order a recess as the appropriate sanction.

Accordingly, under the circumstances here, we conclude the trial court abused its discretion by ordering dismissal of the burglary and criminal mischief counts as a sanction for the prosecution's inadvertent discovery violation, and we thus disapprove of that order.

The judgment of conviction and sentence for theft by receiving—$15,000 or more (a class 3 felony) are vacated, and the case is remanded for the trial court to enter judgment of conviction and for resentencing on theft by receiving—more than $500 but less than $15,000 (a class 4 felony), and to correct the mittimus as directed. In all other respects, the judgment and sentence are affirmed. With respect to the cross-appeal, the trial court's ruling is disapproved.

Judge DAILEY and Judge MILLER concur.