22CA1781 Peo v Jordan 07-25-2024 COLORADO COURT OF APPEALS Court of Appeals No. 22CA1781 City and County of Denver District Court No. 20CR3807 Honorable Eric M. Johnson, Judge The People of the State of Colorado, Plaintiff-Appellee, v. Chadwick Heath Jordan, Defendant-Appellant. JUDGMENT AFFIRMED Division VII Opinion by JUDGE KUHN Tow and Gomez, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced July 25, 2024 Philip J. Weiser, Attorney General, Carmen Moraleda, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee Robinson & Henry, P.C., Benjamin C. Whitney, Denver, Colorado, for Defendant-Appellant 
1 ¶ 1 Defendant, Chadwick Heath Jordan, appeals the judgment of conviction entered on a jury verdict finding him guilty of second degree assault. He also appeals his habitual offender adjudication and the constitutionality of his thirty-two-year prison sentence. We affirm. I. Background ¶ 2 This appeal arises out of a physical altercation between Jordan and the victim. A surveillance video of the incident showed • Jordan driving his truck into a downtown Denver alley and stopping with the victim right next to the driver’s side door; • the victim talking to Jordan, then raising a long stick in Jordan’s direction; • Jordan driving forward slightly before stopping again; • Jordan getting out of his truck, and the victim almost simultaneously swinging the stick and striking Jordan in the left forearm; • Jordan then hitting the victim several times in the head with an object — later identified as an aluminum baseball bat — and wrestling the victim to the ground; 
2 • Jordan getting on top of the victim and repeatedly punching the victim for the next fifteen seconds; and • Jordan standing up and hitting the victim one more time before getting his bat and driving off. ¶ 3 Both men testified at trial, and each gave a vastly different account of the events leading up to their altercation. Jordan testified that he entered the alley because he was looking for a parking spot in the area. He noticed the victim, according to his testimony, after he heard “somebody hitting [his] truck” and saw “someone trying to poke [his] eyes with a stick.” Jordan further testified that, before he got out of the truck, the victim poked him in the eye through the open driver’s door window, and that he then started hitting the victim because he felt “cornered” and feared for his safety. ¶ 4 The victim, on the other hand, testified that his memory of the incident was spotty, but that he remembered “most everything leading up” to the physical altercation. He testified that he was hanging out with his friends near the alley when he observed Jordan’s truck and “occupants in the truck . . . hollering and yelling at people derogatory comments about their race and such as that.” 
3 The victim further testified that, after some of the friends left, Jordan approached the victim in the alleyway and said that “he was going to beat [the victim] to death” before getting out of the truck with the bat. When asked whether he remembered having a stick during his encounter with Jordan, the victim responded that he couldn’t “recall specifically.” ¶ 5 The victim sustained serious bodily injuries during the fight, including multiple facial fractures requiring reconstructive surgery and bleeding in the brain. ¶ 6 In connection with this incident, the prosecution initially charged Jordan with second degree assault, later adding a first degree assault count and three habitual offender counts. The jury acquitted Jordan of first degree assault but found him guilty of second degree assault. The trial court then found that the prosecution had proved the three habitual counts beyond a reasonable doubt and adjudicated Jordan a habitual offender. ¶ 7 The court sentenced Jordan to thirty-two years in the custody of the Department of Corrections (DOC), with three years of parole. 
4 II. Analysis ¶ 8 On appeal, Jordan contends that the trial court erred by (1) instructing the jury on the initial aggressor exception to self-defense; (2) lowering the prosecution’s burden of proof in response to a jury question; (3) adjudicating him a habitual offender because the prosecution presented insufficient evidence that he had three prior felony convictions; and (4) finding that his thirty-two-year sentence didn’t raise an inference of gross disproportionality that would require the court to conduct an extended proportionality review. We disagree with each of these contentions. A. The Trial Court Didn’t Err by Instructing the Jury on the Initial Aggressor Exception to Self-Defense ¶ 9 Jordan first contends that the trial court reversibly erred by including the initial aggressor language in the self-defense jury instruction. We disagree. 1. Additional Background ¶ 10 At the conclusion of its case-in-chief, the prosecution requested an initial aggressor instruction, arguing that such an instruction was appropriate “given the testimony from the witnesses 
5 that there were arguments going on, that there was yelling coming from Mr. Jordan and Mr. Jordan’s vehicle,” and that he drove up to the victim. Defense counsel objected, arguing that the evidence established that the victim, not Jordan, initiated the physical conflict either by thrusting the stick at Jordan while he was still inside his truck or by hitting him with it as he was getting out. In response to these arguments, the trial court pointed out that “[t]he video was far enough away” that it couldn’t determine whether the thrust was a gesticulation or something else, and that Jordan getting out of the truck with a bat and the victim then striking him with the stick supported giving the instruction. The court, however, deferred making a decision until hearing all the evidence. ¶ 11 The prosecution renewed its request for the initial aggressor instruction at the close of all evidence, and the defense again objected. The court initially concluded that such an instruction wasn’t warranted under the circumstances, reasoning that the video is clear that [the victim] does walk up to [the truck] and he certainly thrusts, jabs, does something with his stick in the direction of that cab. And that would fit the definition of initiating physical conflict by using or threatening the imminent use of unlawful physical force. 
6 ¶ 12 In response, the prosecutor pointed out that the victim’s “testimony [was] that when Mr. Jordan was in the car, he had the bat, and he told [the victim] that he was, quote, going to beat [the victim] to death.” Then, “based on that piece of evidence,” the trial court reversed its original decision and included language about the initial aggressor exception in the jury instruction. 2. Applicable Law and Standard of Review ¶ 13 Colorado’s self-defense statute provides that a person is justified in using physical force upon another person in order to defend himself . . . from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he may use a degree of force which he reasonably believes to be necessary for that purpose. § 18-1-704(1), C.R.S. 2023. But the right to self-defense is not limitless. Thus, the prosecution may defeat a defendant’s claim of self-defense by proving beyond a reasonable doubt that the defendant was the initial aggressor. § 18-1-704(3)(b); People v. Roberts-Bicking, 2021 COA 12, ¶ 30. The initial aggressor is the person who initiated the physical conflict by using or threatening the imminent use of unlawful physical force. Castillo v. People, 2018 CO 62, ¶¶ 41, 43. 
7 ¶ 14 A trial court may instruct the jury on the initial aggressor exception to self-defense when some evidence in the record supports the exception. Galvan v. People, 2020 CO 82, ¶ 25. And “[w]hen a trial court is presented with some evidence that a defendant used force in self-defense, and some evidence that the defendant is the initial aggressor, the court should instruct the jury on both self-defense and the initial aggressor exception.” People v. Newell, 2017 COA 27, ¶ 25. “To qualify as ‘some evidence,’ the evidence must be such as would support a reasonable inference that the accused was the initial aggressor . . . .” Roberts-Bicking, ¶ 31; see also Galvan, ¶ 24 n.7 (noting that “some evidence” in support of the instruction is synonymous with “some credible evidence,” “any credible [even if highly improbable] evidence,” “a scintilla of evidence,” “any evidence,” or a “small quantum of evidence”). ¶ 15 We review de novo whether sufficient evidence supports an instruction on the initial aggressor exception to a self-defense claim. Castillo, ¶ 32; People v. Cline, 2022 COA 135, ¶ 31. In doing so, we view the evidence in the light most favorable to giving the challenged instruction. Galvan, ¶ 33. 
8 3. Discussion ¶ 16 Jordan focuses on the victim’s conduct before Jordan got out of the truck because, in his view, that was when the physical altercation began. He contends that the video and his testimony established that the victim initiated the physical conflict by attacking him with the stick while he was still sitting inside his truck. He argues that the only evidence of his aggression before stepping out of the truck was his words, which, standing alone, were insufficient to support the court’s initial aggressor instruction. We’re not persuaded. ¶ 17 To begin, the record doesn’t conclusively establish Jordan’s version of events. The video shows the victim raising the stick, thrusting it in Jordan’s direction, and retracting it just before Jordan starts opening the door. However, it doesn’t definitively show whether the stick made contact with Jordan or his truck at that time. Nor does the video — which has no audio — clearly establish whether the victim was threatening Jordan while waving the stick around. As the trial court noted during the initial jury instruction conference, “[t]he video was far enough away” that the court couldn’t determine what the victim was doing. 
9 ¶ 18 Moreover, there was other evidence supporting the prosecution’s version of events. Recall that the victim testified that Jordan had yelled that “he was going to beat [the victim] to death” before he got out of the truck with the bat. The victim also testified that he saw Jordan’s bat when Jordan opened the truck door. ¶ 19 Jordan argues the trial court was wrong to rely on this testimony to give the instruction for two reasons. First, Jordan posits that “a verbal confrontation alone is insufficient to make a defendant the initial aggressor” and that “there must be some physical action accompanying the words before a defendant can legally be considered the initial aggressor.” Put differently, Jordan argues that his fighting words (i.e., that “he was going to beat [the victim] to death”) didn’t support giving the instruction because they weren’t uttered in concert with a physical act. ¶ 20 But according to the testimony, there were acts in connection with Jordan’s words. The victim testified that right after Jordan uttered his threat, he jumped out of the truck brandishing the bat. This constitutes some evidence that Jordan’s words were accompanied by conduct that threatened the imminent use of unlawful physical force against the victim. See Roberts-Bicking, 
10 ¶¶ 34-35 (concluding that the trial court didn’t err by giving an initial aggressor instruction when there was some evidence in the record that the defendant’s statements that the victims would die were made in conjunction with the defendant brandishing his pistol); see also People v. Whiteaker, 2022 COA 84, ¶ 37 (concluding that an initial aggressor instruction was appropriate because the defendant not only insulted the victim before attacking her, but also approached the victim “in an aggressive manner” with her “fists balled up”), rev’d on other grounds, 2024 CO 25. ¶ 21 The timing of Jordan’s verbal threat and his exit from the truck support this conclusion. The evidence shows that the threat and the act were closely related in time given that the entire incident lasted less than a minute. See Castillo, ¶¶ 47-49 (considering whether a defendant was the initial aggressor as to the entire incident when the incident lasted “much less than a minute” and the defendant’s actions were part of a single criminal episode). ¶ 22 Second, Jordan argues that the trial court erred by relying on the victim’s testimony because it was incredible as a matter of law. “Testimony is ‘incredible as a matter of law’ only if it is about facts that physically could not have been observed or events that could 
11 not have happened under the laws of nature.” People v. Platteel, 2023 CO 18, ¶ 32 (quoting People v. Minjarez, 81 P.3d 348, 355 (Colo. 2003)). ¶ 23 The victim’s testimony doesn’t fall into either category because his statements were about what he heard and saw during the incident (i.e., that Jordan made a verbal threat and that he then saw Jordan’s bat). The testimony was about events the victim experienced, and it didn’t contradict the laws of nature. The testimony also didn’t contradict the inaudible video of the fight; rather, it added context to the video. ¶ 24 True, the victim also testified that he didn’t recall holding the stick or any other object during the encounter, a fact refuted by the video. But the victim added that he would defer to the video because his recollection of the incident was spotty, and he acknowledged what the video showed: “I understand that I’m on video with a stick, so if that’s what’s on the video, then I probably picked something up to protect myself.” While this record reveals that part of the victim’s testimony was incomplete as compared with parts of the video, it wasn’t incredible as a matter of law. See id. 
12 (“[T]estimony that is merely biased, conflicting, or inconsistent is not incredible as a matter of law.”) (citation omitted). ¶ 25 At bottom, the parties here presented evidence supporting both Jordan’s claim that he acted in self-defense and the prosecution’s claim that he was the initial aggressor. The evidence created a factual dispute as to whether the victim had poked Jordan in the eye while he was still inside his truck or whether Jordan came out of the truck swinging the bat to start the physical altercation. Which version of the incident to accept, and, therefore, whether Jordan was legally justified in using physical force against the victim, depended on whose story the jury believed. See Newell, ¶ 28 (“It is for the jury, not the judge, to decide which witnesses and even which version of the witnesses’ testimony is to be believed.”). ¶ 26 Under these circumstances, however, there was evidence to support both versions of events. Therefore, the trial court correctly instructed the jury on both self-defense and the initial aggressor 
13 exception to that affirmative defense.
1 See id. at ¶ 25. Jordan’s instructional error challenge, therefore, must fail. B. Jordan is Precluded from Challenging on Appeal the Trial Court’s Response to a Jury Question ¶ 27 Jordan next contends that the trial court improperly lowered the prosecution’s burden of proof in answering a question that the jury asked during deliberations. The jury inquired about the manner in which the mental state and voluntary act elements of first degree and second degree assault were presented in the elemental instructions (instructions 14 and 13, respectively). The jury question read, We are unclear as to why Element #4 [causing a bodily injury to another person] on instructions 13+14 is on its own line. Like, what’s the difference between Element #3 [intent] and Element 3+4 together? ¶ 28 After discussing this question with the parties, the trial court gave the following response: 1 Jordan argues that we should review his challenge under the constitutional harmless error standard of reversal. The People, on the other hand, assert that nonconstitutional harmless error applies. Because we conclude that the trial court didn’t err by providing the initial aggressor instruction, we need not resolve the parties’ dispute regarding the applicable standard of reversal. 
14 Instructions 13 and 14 list the elements of each crime that must be proven. The various voluntary acts and mental states (see Instruction No. 16) that constitute a crime are simply listed as independent elements. The prosecution bears the burden of proving each element of a crime beyond a reasonable doubt. ¶ 29 Jordan challenges the court’s response on appeal, arguing not only that the court further confused the jury by stating that the two elements were listed separately because they were independent from one another, but also that the court lowered the prosecution’s burden of proof by “incorrectly instruct[ing] the jury [that] it could find Mr. Jordan guilty without the prosecution proving Mr. Jordan had the intent to cause bodily injury.” ¶ 30 The People argue, among other things, that Jordan is precluded from challenging the trial court’s response on appeal because his trial counsel actively participated in — and ultimately approved — that response. We agree with the People. ¶ 31 During the discussion about the jury question with the parties, the court initially proposed telling the jury that “the mens rea mental state of the crime is listed by itself to make clear that the culpable mental state is an element of the offense that must be 
15 proven.” Defense counsel agreed, but added, “And the actions must be done with that mental state, maybe.” ¶ 32 In response to defense counsel’s suggested language, the court noted that it “could make [the answer] a little bit longer” by referring the jury to instruction 16, which contained definitions of the culpable mental state and voluntary act. The court then proposed a new answer, “The various voluntary acts and mental states, see Instruction 16, that constitute a crime are simply listed as independent elements. The prosecution bears the burden of proving each element of a crime beyond a reasonable doubt.” Defense counsel weighed in on this language: [DEFENSE COUNSEL]: I -- my impression is that it would be helpful to [the jury] if it were somehow conveyed that [intent] is the mental state defined in [instruction] 14. That must be present in the elements of the crime describing action or -- I’m trying to think of a concise way to convey that, because sometimes when we get elementals -- the reason the mental state is separate is because there are multiple acts, all of which need to be done with that mental state. And if we put the mental state on the same line as the first act in the chain, it might be confusing, and the jury might think that the second act in that chain doesn’t also require the mental state. 
16 I would just want to convey to the jury something about the mental state applying to each act -- each element that requires an act. ¶ 33 The court took another stab at crafting the answer: All right. We’ll keep it simple. I’m just going to say those are the elements. The prosecution bears the burden of proving each of the elements beyond a reasonable doubt. After the prosecutor asked the court whether this answer was “in lieu of the original proposed which was referring [the jury] to the definition[s]” in instruction 16, the court asked defense counsel which answer he liked better. Counsel responded, “I’d ask for that then, the initial example the Court gave.” The court then finalized the answer that Jordan now challenges on appeal: THE COURT: All right. Here we go. Instructions 13 and 14 list the elements of each crime that must be proven. The various voluntary acts and mental states, see Instruction 16, that constitute a crime are simply listed as independent elements. The prosecution bears the burden of proving each element of a crime beyond a reasonable doubt. [DEFENSE COUNSEL]: That’s acceptable. ¶ 34 The People argue that Jordan is barred from challenging this response under the invited error doctrine. That doctrine prevents a party from complaining on appeal of an error that the party has 
17 invited or injected into the case. People v. Rediger, 2018 CO 32, ¶ 34. “However, its application is limited to situations where an error was caused by a party’s affirmative, strategic conduct and not by a party’s inaction or inadvertence.” People v. Garcia, 2018 COA 180, ¶ 7. ¶ 35 In contrast to invited error, “[t]he doctrine of waiver is a procedural bar to appellate review based on ‘the intentional relinquishment of a known right or privilege.’” Phillips v. People, 2019 CO 72, ¶ 16 (quoting Rediger, ¶ 39). Although a waiver can be implied, the conduct must be unequivocal and clearly manifest an intent to relinquish the claim. Id. at ¶ 21. The mere failure of a party to raise an issue doesn’t suffice. Id. ¶ 36 Here, the record reveals that Jordan not only approved the trial court’s final answer to the jury question but also actively participated in crafting it. True, defense counsel also told the court that he wanted the response to convey the concept that intent applied to the voluntary act element in the instructions. But ultimately, he asked the court to provide an answer that would refer the jury to instruction 16, like “the initial example the Court gave.” The court then agreed to defense counsel’s request and crafted an 
18 answer reflecting his input. Then, defense counsel confirmed that the proposed answer was “acceptable.” ¶ 37 Defense counsel’s actions implicate elements of both invited error and waiver. We need not decide whether the circumstances of this case fit more closely to one doctrine over the other because both preclude appellate review. See Rediger, ¶ 34; Phillips, ¶ 16; see also People v. Jacobson, 2017 COA 92, ¶ 48 (concluding that the invited error doctrine precluded a defendant from challenging a jury instruction and the court’s answer to a jury question when the defendant’s counsel actively participated in preparation of both items); People v. Mendez, 897 P.2d 868, 871 (Colo. App. 1995) (holding that a defendant was precluded from challenging the trial court’s response to a jury question when the record revealed “that not only did the defendant fail to object to the response, [his] defense counsel actively participated in the preparation of the response and approved it”); People v. Phillips, 91 P.3d 476, 484 (Colo. App. 2004) (stating that the defendant was precluded from challenging the trial court’s response to a jury question when the “defendant acceded to the court’s response”). ¶ 38 We therefore decline to address this issue any further. 
19 C. The Prosecution Presented Sufficient Evidence in Support of the Trial Court’s Habitual Offender Adjudication ¶ 39 Jordan next contends that the trial court erred by adjudicating him as a habitual offender because the prosecution failed to present sufficient evidence that he had three prior felony convictions. We again disagree. 1. Applicable Law and Standard of Review ¶ 40 Under section 18-1.3-801(2)(a)(I), C.R.S. 2023, a defendant may be adjudged a habitual offender if the defendant “has been three times previously convicted [of a felony], upon charges separately brought and tried, and arising out of separate and distinct criminal episodes.” “Where the charges against the defendant were separately brought and would have been tried separately but for the defendant’s decisions to enter guilty pleas, the convictions thereby obtained satisfy the definition of predicate felonies in the habitual criminal statute.” People v. Price, 2023 COA 96, ¶ 69 (quoting Gimmy v. People, 645 P.2d 262, 267 (Colo. 1982)) (alterations omitted). ¶ 41 In habitual offender proceedings, the prosecution bears the burden of proving beyond a reasonable doubt that the defendant is 
20 the person who was convicted of the prior offenses. § 18-1.3-803(5)(b), C.R.S. 2023; see also People v. Cooper, 104 P.3d 307, 310 (Colo. App. 2004). “[A] duly authenticated copy of the record of former convictions and judgments of any court of record for any of said crimes,” as well as identification photographs and fingerprints contained in those records or the DOC records (penitentiary pack), constitute prima facie evidence of the defendant’s identity. § 18-1.3-802, C.R.S. 2023. ¶ 42 A claim that the prosecution failed to present sufficient identity evidence requires us to determine whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant was the person who was convicted of the prior offenses. See People v. Moore, 226 P.3d 1076, 1088 (Colo. App. 2009). We review the record de novo in completing this task. See Dempsey v. People, 117 P.3d 800, 807 (Colo. 2005); see also Thomas v. People, 2021 CO 84, ¶¶ 57-58. Such a claim need not be preserved in the trial court and may be raised for the first time on 
21 appeal. See Thomas, ¶ 58; see also McCoy v. People, 2019 CO 44, ¶ 27. 2. Discussion ¶ 43 In connection with the habitual counts, the prosecution asserted that Jordan had pleaded guilty to conspiracy to commit menacing (Adams County Case No. 04CR29), attempted assault of a peace officer (Adams County Case No. 06CR1675), and possession with intent to manufacture or distribute a controlled substance (Denver County Case No. 18CR1675). On appeal, Jordan argues that the prosecution presented insufficient evidence during the sentencing hearing that he was the person who pleaded guilty in those three cases. We’re not persuaded. ¶ 44 There was overwhelming evidence that Jordan was the defendant in each of the prior cases.
2 For starters, the prosecution introduced the testimony of Bradley Murphy, an expert in fingerprint examination. Murphy testified that Jordan’s fingerprints matched the fingerprints that were taken in the prior three cases, 2 Indeed, considering the quality and quantity of evidence supporting the court’s determination, Jordan’s sufficiency challenge borders on frivolous. 
22 saying “[t]hat they’re all the same” and confirming that they all belonged to Jordan. See People v. Carrasco, 85 P.3d 580, 583 (Colo. App. 2003) (“Offering evidence of fingerprint cards and expert testimony linking those prints to the defendant is a valid method for proving the identity element, but it is not the only way to show identity.”). ¶ 45 The prosecution also introduced extensive documentary evidence in support of the habitual counts. That evidence included a triple-certified penitentiary pack, certified copies of the court records for the current case and three prior convictions, and the fingerprint cards, charging documents, mittimuses, and other information linking Jordan to those convictions. See § 18-1.3-802. The documents contained the name, date of birth, gender, race, height, eye color, hair color, social security number (SSN), state identification (SID), and FBI number of the defendant in each case, as well as photos. ¶ 46 The following chart shows that this information was identical in almost every case record: 
23 Table 1: Comparison of Identifying Information (an “X” means that the information matches between the case records) Defendant’s Information Current Case 04CR29 06CR1675 18CR1675 Name Chadwick H. Jordan Chadwick Heath Jordan Chadwick Heath Jordan Chadwick H. Jordan DOB X X X X Gender X X X X Race X X X X Height X (an inch shorter) X X Eye Color X X X X Hair Color Black Black Black Brown SSN X X X (None) SID No. X X X X FBI No. X (None) X X Photo Identification X (7/26/2004 DOC Photo) (4/19/2007 DOC Photo) X Indeed, the relevant case records differed only to the extent that the records for Case No. 04CR29 listed Jordan an inch shorter and didn’t include his FBI number and the records for Case No. 18CR1675 reflected a slightly different color of Jordan’s hair and 
24 didn’t include his social security number. The penitentiary pack contained DOC photos dated July 26, 2004, and April 19, 2007. ¶ 47 Jordan contends that the evidence of his prior convictions was nonetheless insufficient because the expert witness “provided no testimony beyond his standard practices, and provided no specific testimony about what was done to compare fingerprints in this particular case.” Under these circumstances, Jordan argues, the trial court had to require more “than uncorroborated and unchallengeable testimony from a single witness” before entering the habitual offender adjudication. ¶ 48 Jordan doesn’t challenge the admissibility of the expert’s testimony itself. Instead, he claims that the trial court shouldn’t have found the testimony reliable or credible and that it shouldn’t have given the expert’s opinion as much weight as it did. But our sufficiency review doesn’t entail determining the credibility of the witnesses, resolving conflicts in the evidence, or deciding what weight to give each piece of evidence. See People v. Sprouse, 983 P.2d 771, 778 (Colo. 1999). These determinations were squarely within the trial court’s province as the fact finder in this case. 
25 ¶ 49 Jordan also contends that the evidence was insufficient because certain information was present in some but not all the records. His argument implies that the records for each case had to match exactly to constitute sufficient evidence of his identity. But that’s not what the governing test requires. As noted, the evidence — when viewed as a whole and in the light most favorable to the prosecution — must be sufficient and substantial to support a conclusion by a reasonable mind that the defendant was convicted of the felonies underlying the habitual criminal charges. See Moore, 226 P.3d at 1088. It’s true that some data — such as Jordan’s FBI number — wasn’t present in every record. But applying the test described above, we agree with the trial court’s conclusion that “it is very clear that all of these records refer to the same person, to the same Chadwick Jordan.” ¶ 50 Accordingly, we conclude that the prosecution presented sufficient evidence for a reasonable mind to conclude beyond a reasonable doubt that Jordan had three prior felony convictions, which, in turn, supported his habitual offender adjudication. See § 18-1.3-801(2)(a)(I). 
26 D. Jordan Wasn’t Entitled to an Extended Proportionality Review ¶ 51 Lastly, Jordan argues that the trial court erred by not conducting an extended proportionality review before imposing a thirty-two-year prison sentence. We perceive no error. 1. Additional Background ¶ 52 Because the trial court adjudicated Jordan a habitual offender, it sentenced him in accordance with section 18-1.3-801. This provision requires a court to sentence a habitual offender to “a term of four times the maximum of the presumptive range” for the triggering offense. § 18-1.3-801(2)(a)(I)(A). Jordan’s conviction for second degree assault under these circumstances, a class 4 felony as modified for an extraordinary risk crime, carried a maximum sentence of eight years in prison. See § 18-3-203(1)(b), (2)(b), (c)(II), C.R.S. 2023; § 18-1.3-401(1)(a)(V)(A.1), (10)(a)-(b), C.R.S. 2023; § 18-1.3-406(2)(a)(I)(A), (II)(C), C.R.S. 2023. Consequently, the trial court had to sentence him to a thirty-two-year term in the custody of the DOC. 
27 2. Applicable Law and Standard of Review ¶ 53 The United States and Colorado Constitutions prohibit “extreme sentences that are ‘grossly disproportionate’ to the crime.” Wells-Yates v. People, 2019 CO 90M, ¶ 5 (quoting Harmelin v. Michigan, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring)); see also U.S. Const. amend. VIII; Colo. Const. art. II, § 20. ¶ 54 If a defendant believes that he has been subjected to an unconstitutionally disproportionate sentence, he may request (as Jordan did here) a proportionality review in which a court will compare the gravity or seriousness of his current and past offenses — the triggering and predicate offenses, respectively — to the harshness of the sentence imposed for the triggering offense. Wells-
Yates, ¶¶ 8, 23. ¶ 55 A proportionality review of a habitual criminal sentence proceeds in two steps. Id. at ¶ 10. In step one, the court first considers the gravity or seriousness of the triggering offense and the predicate offenses in combination. Id. at ¶¶ 10-14, 23-24. The court must then compare that to the harshness of the penalty imposed for the triggering offense. Id. “[T]he inquiry is whether the corresponding triggering offense and the predicate offenses, 
28 considered together, are so lacking in gravity or seriousness as to suggest that the sentence is grossly disproportionate.” Id. at ¶ 24. ¶ 56 Certain crimes — such as aggravated robbery, burglary, accessory to first degree murder, and the sale or distribution of narcotics — have been declared per se grave or serious under Colorado law. Id. at ¶¶ 13, 65. For all other crimes, the court engages in a fact-specific inquiry of the harm caused or threatened to the victim or society and the culpability of the defendant to determine whether the offense is grave or serious. Id. at ¶ 12. ¶ 57 Only if step one — the abbreviated proportionality review — gives rise to an inference of gross disproportionality does a court proceed to step two, which is an extended proportionality review. Id. at ¶ 8. “In the rare situation in which the analysis advances to step two,” the court should compare the defendant’s sentence for the triggering offense to sentences for other offenses in the same jurisdiction and sentences for the same offense in other jurisdictions. Id. at ¶¶ 7, 15, 17. ¶ 58 We review de novo whether a defendant’s sentence is unconstitutionally disproportionate. Id. at ¶ 35. 
29 3. Discussion ¶ 59 Before imposing the sentence, the trial court conducted an abbreviated proportionality review. It considered the seriousness of Jordan’s triggering and predicate offenses along with the harshness of his sentence. In doing so, the court accepted the prosecutor’s recitation of facts underlying the offenses and found that those offenses, in combination, were grave or serious. Specifically, the court found that, [t]aking into consideration the violence of at least the prior assault [of a peace officer], the harm to society inherent in the menacing, and the extreme violence in this particular case, I cannot find that taken together, in combination, that the triggering offense and the predicate offenses are so lacking in gravity or seriousness that there should be an inference that this [sentence] is grossly disproportionate. ¶ 60 The court also assessed the harshness of Jordan’s thirty-two-year sentence, noting, “We’re not talking about life, we are talking about a sentence that is determinate and one for which Mr. Jordan would eventually qualify for parole.” ¶ 61 After conducting this abbreviated proportionality review, the court concluded that Jordan’s sentence didn’t raise an inference of 
30 gross disproportionality, and that he was therefore not entitled to an extended proportionality review. ¶ 62 Jordan argues that the trial court erred by concluding that his thirty-two-year sentence wasn’t grossly disproportionate after only conducting the abbreviated proportionality review. Because Jordan’s triggering offense and his predicate offenses were grave or serious, and his sentence isn’t unconstitutionally harsh, we perceive no error. a. Triggering Offense ¶ 63 We begin our analysis by considering whether Jordan’s triggering offense — second degree assault — was grave or serious under the circumstances. We conclude that it was. ¶ 64 As the trial court noted, the facts underlying Jordan’s second degree assault conviction “were of extreme violence.” He struck the victim multiple times in the head using a baseball bat as a deadly weapon. After taking the victim to the ground, Jordan repeatedly punched the victim for the next fifteen seconds. One eyewitness testified that Jordan was acting with a “pure blackout rage” and that he was beating the victim like “a sack of potatoes.” See People v. Loris, 2018 COA 101, ¶ 12 (noting that whether an offense 
31 involved violence is a factor in determining the offense’s gravity or seriousness). Jordan’s conduct also caused significant bodily harm, leaving the victim with multiple facial fractures and bleeding in the brain. See Close v. People, 48 P.3d 528, 541-42 (Colo. 2002) (concluding that second degree assault was grave or serious under the facts of the case because the defendant’s acts, among other things, “caused actual harm to the victims, including the infliction of a swollen nose, facial and head lacerations, and bruises”), abrogated on other grounds by Wells-Yates, ¶¶ 16, 55-66. b. Conspiracy to Commit Menacing ¶ 65 The facts underlying Jordan’s first predicate offense — conspiracy to commit menacing, Adams County Case No. 04CR29 — are likewise very serious.
3 According to the probable cause 3 Both the supreme court and divisions of our court have previously designated felony menacing as a per se grave or serious offense. See Close v. People, 48 P.3d 528, 538 (Colo. 2002), abrogated on other grounds by Wells-Yates v. People, 2019 CO 90M, ¶¶ 16, 55-66, 65 n.18 (declining to address whether felony menacing is per se grave or serious offense); see also People v. Stellabotte, 2016 COA 106, ¶ 59, aff’d, 2018 CO 66. We need not decide whether this designation remains good law or whether it extends to conspiracy to commit menacing because we conclude that the facts of that offense make it grave or serious here. 
32 affidavit for his arrest, Jordan entered a convenience store holding a two-foot-long chrome bar, ordered everyone in the store to go to the back of it, and called the cashier “a fucking bitch.” In her statements to the police, the cashier “stated that she was extremely scared” during this incident. This record shows that Jordan’s intentional conduct placed the cashier and those present in the store in fear for their safety and well-being. See Wells-Yates, ¶ 12. c. Attempted Second Degree Assault of a Peace Officer ¶ 66 We next consider the facts of Jordan’s attempted second degree assault of a peace officer conviction — Adams County Case No. 06CR1675. In that case, Jordan physically attacked a deputy who was conducting a check of his jail cell. According to the probable cause affidavit, Jordan disobeyed an order asking him to uncover a cell window, telling the requesting officer, “Fuck you and fucking get away from my door.” After another officer entered the cell and asked Jordan what was wrong with him, Jordan approached the officer “in an aggressive manner with his fists cl[e]nched and his chest puffed.” He then refused the officer’s orders to place his hands on the wall and, instead, punched the officer in the jaw. 
33 ¶ 67 Jordan contends that this offense wasn’t grave or serious because there was no evidence that the officer suffered serious bodily harm. In his words, “[a] punch to the face causing non serious injury would be a misdemeanor, but for the fact the person punched in the case was a jail officer.” That may be true, but it doesn’t make Jordan’s conduct less grave or serious. Crimes against peace officers are treated differently because “[t]he legislature recognized that peace officers are placed in a position of great risk and responsibility in enforcing laws, preventing crime and the myriad of other tasks they are called upon to perform.” People v. Montoya, 104 P.3d 303, 306 (Colo. App. 2004) (quoting People v. Prante, 177 Colo. 243, 249, 493 P.2d 1083, 1086 (1972)). ¶ 68 Jordan’s conduct in the predicate assault case highlights these concerns. In addition to physically assaulting one of the officers, he also significantly escalated the encounter, resulting in a dangerous situation. The altercation ended only after he was tased and restrained by six officers. See Wells-Yates, ¶ 12 (in assessing the harm and culpability factors to determine whether an offense is grave or serious, we consider, among other things, the absolute 
34 magnitude of the crime and whether the defendant acted with intent or some other culpable mental state). d. Possession with Intent ¶ 69 Finally, in Denver County Case No. 18CR1675, Jordan pleaded guilty to possession with intent to manufacture or distribute a controlled substance after cocaine was found in his car during a traffic stop. ¶ 70 The probable cause affidavit for Jordan’s arrest stated that he was in possession of two plastic bags and several glass vials that contained a significant amount of cocaine. The affidavit further stated that the manner in which the cocaine was packaged, coupled with the amount, suggested that Jordan intended to sell or distribute it, not merely use it himself. See id. at ¶ 69 (noting that a drug offense may be grave or serious when a defendant possesses a large quantity of drugs). ¶ 71 In addition to drugs, the police also found in Jordan’s car a pair of brass knuckles, various parts and assembly instructions for an AR-15 assault rifle, as well as a “Hannib[al] Lecter mask.” Jordan contends that these additional facts shouldn’t be considered in determining the gravity or seriousness of his drug offense 
35 because they were part of the probable cause affidavit and had no connection to his conviction. ¶ 72 Jordan, however, doesn’t provide any legal authority for his sweeping proposition that a court may not rely on a probable cause affidavit when considering the gravity or seriousness of a particular offense. Cf. People v. Hargrove, 2013 COA 165, ¶¶ 16-17 (affirming the trial court’s determination that a crime wasn’t grave or serious after the trial court made that decision in reliance on the facts set forth in the probable cause affidavit), abrogated on other grounds by Wells-Yates, ¶¶ 16-17. ¶ 73 Moreover, while Jordan wasn’t convicted of any crime in relation to the additional items that were found in his car — even though he was charged, among other things, with four counts of possession of a weapon by a previous offender — the discovery of the brass knuckles and various AR-15 parts was still relevant because it increased the gravity or seriousness of his conduct. See Wells-Yates, ¶ 71 (“[W]e conclude that the gravity or seriousness of possession with intent should be determined on a case-by-case basis by considering the surrounding facts and circumstances of the particular crime committed.”). This is especially true given that 
36 the weapons were discovered after the police received information that Jordan had allegedly “made comments to his [school] counselor and campus staff about being in possession of an AR[-]15 and other handguns and expressing ideations that he was in support of military mass killings.” ¶ 74 Considering this record, then, we conclude that Jordan’s triggering offense and his three predicate offenses are grave or serious in combination. e. Harshness of the Penalty ¶ 75 As we have already noted, the trial court imposed a sentence that was established by the General Assembly. See People v. Deroulet, 48 P.3d 520, 523 (Colo. 2002) (when considering the harshness of the defendant’s sentence, “a great deal of deference is due to legislative determinations regarding sentencing”), abrogated on other grounds by Wells-Yates, ¶¶ 16-17. Further, as the trial 
37 court noted, Jordan is eligible for parole.
4 See Wells-Yates, ¶ 14 (noting that we consider whether the defendant is parole eligible when assessing the harshness of the sentence “because parole can reduce the actual period of confinement and render the penalty less harsh”). ¶ 76 When considered together and in concert with his parole eligibility, then, the triggering and predicate offenses aren’t so lacking in gravity or seriousness as to suggest that Jordan’s sentence is unconstitutionally disproportionate to his crime and criminal recidivism. See id. at ¶ 24. Accordingly, we perceive no error in the trial court’s conclusion that an extended proportionality review of Jordan’s sentence was unnecessary in this case. III. Disposition ¶ 77 The judgment is affirmed. JUDGE TOW and JUDGE GOMEZ concur. 4 In his opening brief, Jordan asserts that he will need to serve seventy-five percent, or twenty-four years, of his sentence before becoming parole eligible. The People argue, based on DOC records, that he will be eligible for parole in 2037, after completing half of his sentence. We need not decide which date is correct, because the relevant inquiry focuses on if he is parole eligible, not what his parole eligibility date will be. See Wells-Yates, ¶ 14.